45 F.3d 790
 Frank M. DiMEGLIO, Plaintiff-Appellee,
v.
J. Robert HAINES, individually and in his former official
capacity as Zoning Commissioner of Baltimore
County, Maryland, Defendant-Appellant,
and
Arnold M. Jablon, individually and in his official capacity
as Director of Zoning Administration and Development
Management of Baltimore County, Maryland; Roger Hayden,
individually and in his official capacity as Executive of
Baltimore County, Maryland; Baltimore County, Maryland, a
municipal corporation, Defendants.
 No. 94-1569.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1994.
Decided Feb. 2, 1995.
 
 ARGUED: Kathleen Morris McDonald, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, MD, for appellant. Donald Frederick Chiarello, Hochberg, Chiarello, Costello & Dowell, Towson, MD, for appellee. ON BRIEF: Charles M. Kerr, Brian C. Temple, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, MD, for appellant. Michael P. Tanczyn, Towson, MD; Charles Mentzer, Baltimore, MD, for appellee.
 Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.
 Vacated and remanded by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER and Judge WILLIAMS joined.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 Appellant J. Robert Haines, formerly the Zoning Commissioner of Baltimore County, appeals from an order of the United States District Court for the District of Maryland denying his motion for summary judgment on appellee Frank M. DiMeglio's federal section 1983 and state law claims. Because the district court erred in denying Haines qualified immunity on the section 1983 claim, we vacate the judgment below and remand with instructions to enter judgment in favor of Haines on that claim.
 
 I.
 
 2
 Haines served as Zoning Commissioner for the Office of Zoning for Baltimore County ("the Office") from 1987 to 1991. During his tenure, the practice of the Office was to assign each zoning inspector a specific geographic area of the county within which to investigate zoning violations; the seven areas of assignment roughly equalled the seven council districts. In March 1989, the Office hired DiMeglio as its eighth zoning inspector. Apparently, the Office did not redraw the assignment areas upon DiMeglio's hire, in part because no government vehicle was available for his exclusive use. Instead, the Office positioned him to serve in an at-large or county-wide capacity to handle overflow cases.
 
 
 3
 In August 1990, DiMeglio was investigating "the Partlett case," and, with Haines' approval, had issued a citation against the Partletts for several zoning violations. On September 11, 1990, DiMeglio, as a representative of the Office, attended a meeting of the Earl's Beach Improvement Association ("EBIA"), a citizens' group concerned with the case. DiMeglio learned that the Partletts' attorney had proposed a settlement between his client and the EBIA, whereby the Partletts would correct some, but not all, of the zoning violations and would pay $2500 towards the EBIA's attorney's fees. At this point, DiMeglio addressed the meeting, stating essentially that the offer was not a "good deal" because the EBIA could not agree to permit the Partletts to continue violating pertinent zoning requirements. J.A. at 12-13. Shortly thereafter, DiMeglio alleges that Haines personally reprimanded him for giving legal advice to the EBIA and that Haines convened a meeting of all zoning inspectors where he "admonished them against giving 'legal advice' to citizens' groups." J.A. at 14. Also, according to DiMeglio, in October or November 1990, Haines advised DiMeglio that "the citizens complaining about the zoning violation on the Partlett property 'don't care anymore' and that 'a deal is being made at the Board [of Appeals].' " J.A. at 15-16 (alteration in original). Haines allegedly also stated, regarding a hearing on the case, that, "Nobody's going to show up. Don't stick your neck out. I won't back you up." J.A. at 16.
 
 
 4
 In December 1990, Haines redrew the seven zoning-inspector territories into eight territories. Seven of the eight inspectors were then reassigned, including DiMeglio, who was assigned to a territory in northern Baltimore County. The reassignment coincided with an additional county vehicle becoming available for DiMeglio's sole use. DiMeglio's salary and benefits were not reduced, nor were any perquisites of his office adjusted or eliminated. DiMeglio also contends that after this reassignment, Haines told him that "[y]ou'll never be promoted in this Office," J.A. at 17, however at no time after these actions occurred was DiMeglio eligible for or denied a promotion.
 
 
 5
 Almost three years later, DiMeglio brought this suit under 42 U.S.C. Sec. 1983, alleging that Haines had violated his rights under the First and Fourteenth Amendments by reassigning him to a different enforcement territory in retaliation for his exercise of free speech. DiMeglio also asserted state law claims, including a violation of Article 40 of the Maryland Declaration of Rights and common-law tortious interference with contract.
 
 
 6
 Haines pleaded a defense of qualified immunity and moved for summary judgment on that ground. The district court, without a hearing and by letter order dated April 7, 1994, denied Haines' motion summarily, stating only that "there are differences as pointed out in the motion as well as in the plaintiff's response" and "[s]ince discovery has not been completed, summary judgment at this time is inappropriate under the appropriate court rulings." J.A. at 245. Haines filed this interlocutory appeal. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985).
 
 II.
 A.
 
 7
 Government officials are protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). For this reason, immunity shields officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). When a plaintiff seeks to hold an official personally liable for his exercise of a discretionary function, the court must, in addressing the qualified immunity defense, consider whether the plaintiff has alleged a violation of law that was clearly established at the time the challenged actions were taken. This inquiry is a pure question of law, see Harlow, 457 U.S. at 818, 102 S.Ct. at 2738, and "hence always capable of decision at the summary judgment stage." Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992). See also Siegert v. Gilley, 500 U.S. 226, 231, 232, 111 S.Ct. 1789, 1792-93, 1793, 114 L.Ed.2d 277 (1991); Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815 ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").[1] Indeed, the Supreme Court has repeatedly recognized that because the question of immunity is essentially a legal question, see Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815, "[i]mmunity ordinarily should be decided by the court long before trial." Hunter v. Bryant, 502 U.S. 224, 228-29, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). "[E]ven such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.' " Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815 (second alteration in original) (quoting Harlow, 457 U.S. at 817, 102 S.Ct. at 2737).
 
 
 8
 A district court may deny a motion for summary judgment based on qualified immunity and allow discovery to proceed only if it has addressed the threshold immunity question, and concluded (1) that the plaintiff alleged a violation of a clearly established right, but (2) that there existed a material factual dispute over what actually occurred, and (3) under the defendant's version, a reasonable official could have believed that his conduct was lawful. Anderson, 483 U.S. at 646-47 n. 6, 107 S.Ct. at 3042 n. 6. In instances where there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved without discovery. Id. In such circumstances, it simply may be impossible to protect the defendant from all of the burdens that attend the pretrial process. Of course, after discovery and upon a proper motion, the district court may reconsider the question of qualified immunity. "[I]f discovery fail[ed] to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts," the defendant will yet be entitled to summary judgment, even though the acts alleged by the plaintiff constitute a violation of clearly established rights. Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815; see Turner v. Dammon, 848 F.2d 440, 443-44 (4th Cir.1988).
 
 B.
 
 9
 Although the Supreme Court's decision in Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), has generated significant confusion, that case did not, contrary to the view of almost every court, effect a fundamental change in this analytical framework for deciding whether an official is entitled to qualified immunity. The Court in Siegert did nothing other than clarify that this is the framework within which the qualified immunity analysis is to be undertaken, as it said it was doing.
 
 
 10
 A large number of courts have read Siegert as requiring a determination, under current law, of whether the plaintiff has stated a claim upon which relief can be granted. Some of these courts seem to read Siegert to require this Rule 12(b)(6) or Rule 12(b)(6)-like determination as the first step of the qualified immunity analysis. For example, in Hinton v. City of Elwood, 997 F.2d 774 (10th Cir.1993), the Tenth Circuit concluded that "a court reviewing a qualified immunity claim [must] analyze the state of the law at two different times": It "must analyze the law at the time of trial to determine whether the plaintiff has alleged a violation of existing law," and then "analyze the law at the time of the alleged conduct in order to determine whether the plaintiff has established that the defendant's conduct, when perpetrated, violated clearly established law." Id. at 779-80. Applying this analytical structure, the court held that the plaintiff "failed to demonstrate that [the defendants'] conduct violated the current Fourth Amendment standard governing excessive force claims." Id. at 780. This "failure to satisfy the first prong ... render[ed] it unnecessary for [the court] to consider whether [the plaintiff] satisfied his burden under the second prong by showing that [the defendants] violated clearly established law." Id. See also Hunter v. District of Columbia, 943 F.2d 69, 76 (D.C.Cir.1991) (concluding that Siegert "mandat[ed]" a two-part qualified immunity analysis under which the court must determine whether the complaint alleges both that the plaintiff has been deprived of a constitutional right that exists under current law and that the right in question was "clearly established" at the time the defendant acted); Bella v. Chamberlain, 24 F.3d 1251, 1254-56 (10th Cir.1994) (inquiring first into whether the plaintiff has stated a constitutional claim under current law, "and though this inquiry takes place in the context of a qualified immunity defense," applying "the same rules governing dismissal of complaints"); Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir.1992) ("At this early stage in the proceedings, the Rule 12(b)(6) defense and the qualified-immunity defense become intertwined."), cert. denied, --- U.S. ----, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993). Cf. Buckley v. Fitzsimmons, 20 F.3d 789, 792 (7th Cir.1994) (A court "may" have "to determine whether the complaint states a claim on which relief may be granted" in order to determine whether "the defendants [are] entitled to qualified immunity given the state of the law when they acted."), cert. denied,--- U.S. ----, 115 S.Ct. 740, 130 L.Ed.2d 642 (1995).
 
 
 11
 Other courts that have understood Siegert to require a determination of whether the plaintiff has stated a claim upon which relief can be granted seem to view this determination as an independent inquiry antecedent to the qualified immunity question. See, e.g., Wilson v. Formigoni, 42 F.3d 1060, 1064 (7th Cir.1994) ("[B]efore we even reach the immunity claim, the plaintiff's complaint must state a claim on which relief may be granted."); Spivey v. Elliott, 29 F.3d 1522, 1524 (11th Cir.1994) (concluding that Siegert requires a determination of whether the plaintiff has alleged a violation of a constitutional right under current law, before considering whether that law was clearly established at the time of the challenged conduct); Brown v. Nix, 33 F.3d 951, 953-55 (8th Cir.1994) (same); Grady v. El Paso Community College, 979 F.2d 1111, 1113, 1114 (5th Cir.1992) ("Our first step when reviewing the denial of qualified immunity is whether the plaintiff has stated a claim for the violation of federal rights.... Because [the] complaint states a violation of federal rights, we turn to the question of whether [the plaintiff] has met his burden on summary judgment of showing that [the defendant's] conduct does not entitle her to qualified immunity."); Duckett v. City of Cedar Park, 950 F.2d 272, 279 (5th Cir.1992) ("We find that Duckett ... has stated a constitutional challenge.... We now turn to the issue of defendants' entitlement to qualified immunity ...." (emphasis in original)).[2]
 
 
 12
 Still other courts have read Siegert as requiring resolution of the merits of the constitutional claim under current law before consideration of the qualified immunity issue. For example, in Calhoun v. New York State Div. of Parole Officers, 999 F.2d 647 (2d Cir.1993), the Second Circuit understood Siegert to have established that "the merits of a constitutional claim are a preliminary inquiry required before passing on an issue of qualified immunity." Id. at 652. Accordingly, the court addressed fully the constitutional claim presented, recognizing a particular due process right for the first time in that circuit. Id. at 652-54. Only then did the court address the qualified immunity issue, holding that qualified immunity must apply because the legal rule adopted for the first time in that case could not have been clearly established at the time of the defendant's conduct. Id. at 654-55. In Silver v. Franklin Township Bd. of Zoning Appeals, 966 F.2d 1031 (1992), the Sixth Circuit interpreted Siegert similarly and held that the district court erred in granting qualified immunity on the ground that "no clearly established constitutional right" existed, without having first addressed the merits of the constitutional claim. Id. at 1034-36; see also LeRoy v. Illinois Racing Bd., 39 F.3d 711, 713 (7th Cir.1994) ("[T]he merits of the constitutional claim are an antecedent issue whenever the defendants plead immunity...."). The Silver court, and perhaps others in this category, read Siegert as having "rejected the plaintiff's claim without reaching the qualified immunity issue." See Silver, 966 F.2d at 1036.
 
 
 13
 We believe all of these courts have overread, and in so doing misread, Siegert. Siegert did not announce any change in qualified immunity law, much less one of the proportion assumed by these courts.
 
 1.
 
 14
 Siegert was an unexceptional application of the Court's established qualified immunity jurisprudence. The decision merely reaffirmed that, in deciding qualified immunity claims, courts should determine whether the plaintiff has alleged the violation of a constitutional right that was clearly established at the time of the defendant's actions, before they proceed to address any ancillary issues. This is apparent from what the Supreme Court identified as the error committed by the court of appeals, the reasoning employed by the Court in addressing that error, and the Court's ultimate holding in the case.
 
 
 15
 The court of appeals in Siegert had held that defendant Gilley was entitled to qualified immunity because Siegert's complaint, by "fail[ing] to offer any direct evidence that the letter [of reference critical of the plaintiff's job performance] was written maliciously," failed to satisfy the circuit's heightened pleading requirement. Siegert v. Gilley, 895 F.2d 797, 804-05 (D.C.Cir.1990). In reaching its decision, the court had "assume[d], without deciding," that if Gilley had acted with bad faith and malice, as Siegert alleged, "Gilley's actions in writing the letter [would constitute] a violation of Siegert's constitutional rights." Id. at 803.
 
 
 16
 The Supreme Court held that "the Court of Appeals should not have assumed, without deciding, this preliminary issue ... nor proceeded to examine the sufficiency of the allegations of malice." Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. Rather, the court of appeals should have first resolved the "threshold immunity question" of Harlow--whether, based on the plaintiff's allegations, the defendant had violated clearly established law at the time of the actions. Id. (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738) (emphasis added by Court in Siegert ). Had the court of appeals undertaken this threshold immunity inquiry, the Supreme Court explained, it would have concluded that "Siegert failed not only to allege the violation of a constitutional right that was clearly established at the time of Gilley's actions, but [in light of Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ] he failed to establish the violation of any constitutional right at all." Siegert, 500 U.S. at 233, 111 S.Ct. at 1794.
 
 
 17
 Siegert did not mandate that courts determine, as a part of the qualified immunity analysis, whether the plaintiff has stated a claim upon which relief can be granted in a Rule 12(b)(6) sense. It did not direct courts to decide, independent of and prior to addressing a defendant's entitlement to qualified immunity, whether a plaintiff has stated a claim upon which relief can be granted. Nor did it require that courts decide the merits of the constitutional claim. Consistent with the Court's recitation that it granted certiorari in the case "to clarify the analytical structure under which a claim of qualified immunity should be addressed," id. at 231, 111 S.Ct. at 1793, Siegert simply reaffirmed that a court reviewing a qualified immunity defense should assess, before anything else, whether the alleged conduct violated law clearly established at the time the conduct occurred. The Court's holding could not have been clearer: "We hold that the petitioner in this case failed to satisfy the first inquiry in the examination of ... a claim [of qualified immunity]; he failed to allege the violation of a clearly established constitutional right." Id. (emphasis added); see also id. at 236, 111 S.Ct. at 1795 (Marshall, J., dissenting) (The majority "decid[es] today that petitioner Siegert failed to allege a violation of a clearly established constitutional right...."). The term "clearly established" has an acquired meaning referencing qualified immunity, with its focus on law at the time of the challenged conduct. The Court's use of the term "clearly established" in its holding confirms that it was conducting the typical qualified immunity analysis under Harlow and not a Rule 12(b)(6) inquiry based upon current law.
 
 2.
 
 18
 That the Court did not intend to alter the qualified immunity analysis in any of the ways perceived by the courts above also seems plain for reasons beyond the logic and language of the Siegert opinion.
 
 
 19
 First, and not insignificantly, the Court has repeatedly explained that the immunity inquiry is distinct from both a merits and Rule 12(b)(6) review. See Mitchell, 472 U.S. at 529 n. 10, 105 S.Ct. at 2817 n. 10 ("[T]he legal determination that a given proposition of law was not clearly established at the time the defendant committed the alleged acts does not entail a determination of the 'merits' of the plaintiff's claim that the defendant's actions were in fact unlawful."); id. at 527-28, 105 S.Ct. at 2816 ("[A] claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated."); id. at 528, 105 S.Ct. at 2816 ("An appellate court reviewing the denial of the defendant's claim of immunity need not ... determine whether the plaintiff's allegations actually state a claim. All it need determine is ... whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions...."). Cf. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980) ("[T]his Court has never indicated that qualified immunity is relevant to the existence of the plaintiff's cause of action; instead we have described it as a defense available to the defendant in question." (citations omitted)).
 
 
 20
 Second, requiring that courts conduct a Rule 12(b)(6), Rule 12(b)(6)-like, or merits review would threaten to increase the burden of defending suits for public officials whose conduct was reasonable, by expanding the number of issues officials must prepare to address, brief, and argue. Such a requirement would undermine one of the express purposes of immunity, which is, "to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. Moreover, any one of these additional issues could require a greater expenditure of resources even than would be required to advance merely the qualified immunity defense. Often, it will be more difficult to rebut the argument that the plaintiff's complaint states a claim for which relief can be granted under current law or that the plaintiff should prevail on the merits, than it will be to defend against the claim that the actions violated law that was clearly established at the time they were taken. See discussion infra. Not only would officials bear the burden of responding to arguments based upon current law, they might be saddled with the additional burdens associated with responding to repleading by the plaintiff in the event of dismissal under Rule 12(b)(6).
 
 
 21
 Third, if Siegert had introduced one of the aforementioned inquiries into the analysis, the conceptual understanding of qualified immunity as a doctrine exclusively focused on the reasonableness of official conduct would have been altered in at least two dramatic ways.
 
 
 22
 An official's entitlement to qualified immunity has never turned on whether his conduct actually violated the law; rather, it has always turned on "the 'objective legal reasonableness' of [his] action." Anderson, 483 U.S. at 639, 107 S.Ct. at 3038 (quoting Harlow, 457 U.S. at 819, 102 S.Ct. at 2739). However, neither in deciding under Rule 12(b)(6) whether a plaintiff has stated a claim upon which relief can be granted, nor in evaluating the merits of a claim, is the reasonableness of the defendant's actions--the "touchstone" of qualified immunity, id.--determinative or even relevant.
 
 
 23
 Most important, the legal reasonableness of the defendant's actions is to be "assessed in light of the legal rules that were 'clearly established' at the time it was taken," not in light of current law. Id. (emphasis added) (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). In both a merits review and a Rule 12(b)(6) or Rule 12(b)(6)-like review, however, a court generally examines current law. And there is simply no necessary relationship between current and past law such that an inquiry into the former will always inform the inquiry into the latter. A right that exists today may not have existed at the time of the alleged conduct. A right that existed at the time of the conduct may not exist today. This is especially true in the case of statutory rights, which also can give rise to lawsuits against government officials. For these reasons, current law is not, technically, relevant to the defendant's entitlement to qualified immunity.
 
 
 24
 That current law has no application to the specific question of qualified immunity is not to say that courts should be foreclosed from conducting a Rule 12(b)(6) or 12(b)(6)-like inquiry, or, in rare circumstances a summary judgment inquiry, independent of the qualified immunity defense. In many cases where a defendant has asserted qualified immunity, dismissal or even an award of summary judgment may be obviously warranted, based upon existing law, without the court ever ruling on the qualified immunity question. Recognition of these possibilities is presumably what underlay Justice Powell's observation in Harlow that "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). For example, it may be readily apparent on the face of the plaintiff's complaint that, even accepting the facts as he alleges them to be, he cannot possibly prevail on the merits of his claim under current law. See, e.g., Buckley v. Fitzsimmons, --- U.S. ----, ----, 113 S.Ct. 2606, 2620, 125 L.Ed.2d 209 (1993) (Scalia, J., concurring) ("[M]any claims directed at [public officials] ... are probably not actionable under Sec. 1983, and so may be dismissed at the pleading stage without regard to immunity." (emphasis added)). Similarly, in some cases, after discovery limited to the question of qualified immunity, see Anderson, 483 U.S. at 646-47 n. 6, 107 S.Ct. at 3042 n. 6, it may be that no genuine issue of material fact will exist and that the defendant unquestionably will be entitled to judgment as a matter of law on the merits of the plaintiff's claim; discovery could reveal, for example, that the defendant did not even commit the act alleged. In these circumstances, courts should be free to dispose of the case on these grounds, rather than on the ground of qualified immunity.
 
 
 25
 On the other hand, it will often be more difficult to determine whether the plaintiff has stated a claim under current law or would prevail on the merits, than to determine whether the plaintiff has alleged the violation of law clearly established at the time the defendant acted. See, e.g., Calhoun, 999 F.2d at 652-55 (court conducts lengthy analysis of current law and finds that plaintiff established a constitutional claim, only to dismiss easily on traditional qualified immunity grounds); Spivey, 29 F.3d at 1527 (court conducts lengthy analysis of current law even though, at the time of the defendant's conduct, "no reported case addressed" plaintiff's particular circumstances and "there [was] ... much room for differing interpretations" of the law). Cf. Siegert, 500 U.S. at 235, 111 S.Ct. at 1795 (Kennedy, J., concurring) (concluding it was easier for court of appeals to address sufficiency of plaintiff's allegations of malice than whether substantive right existed in light of Paul v. Davis). In these circumstances as well, the courts should be free to decide the case on the most expedient ground. We are confident that the Supreme Court recognizes as much, and for this reason, would not have imposed a rigid framework requiring a Rule 12(b)(6) or merits inquiry before or adjunct to consideration of the qualified immunity question.
 
 
 26
 The magnitude of the conflicts between the discussed interpretations of Siegert and the bedrock principles of the qualified immunity doctrine laid down in the Court's pre-Siegert cases alone renders it almost inconceivable that the Supreme Court would have effected any of these sea changes without acknowledging that it was doing so--indeed, while expressly purporting not to have modified, but only to have clarified, the established framework. It is especially unlikely that the Court would have fundamentally reshaped the doctrine in Siegert, when it appears the Court decided the case on the unexceptional qualified immunity ground that it did, only to avoid a decision on the heightened pleading standard or to clarify its prior holding in Paul v. Davis, or, more likely, both. See Siegert, 500 U.S. at 236-39, 111 S.Ct. at 1795-97 (Marshall, J., dissenting) (criticizing the Court for deciding scope of Paul v. Davis, rather than validity of heightened pleading standard on which certiorari had been granted). The parties did not understand any question relating to the basic framework for deciding qualified immunity claims even to be before the Court. The questions presented to the Court, briefed by the parties, and upon which certiorari was granted, concerned the validity of the heightened pleading standard and whether the plaintiff had met that standard.[3] Neither party in any way addressed the basic framework within which the qualified immunity question is to be decided. Nor did either party even as much as suggest that it first must be decided under current law whether the plaintiff either had stated a claim upon which relief could be granted or would prevail on the merits.
 
 
 27
 That the Court itself has not applied or even mentioned a new inquiry in its qualified immunity cases decided after Siegert reinforces the conclusion that Siegert in no way altered qualified immunity review. Notably, the very next Term in Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam ), without even citing Siegert, the Court applied its traditional qualified immunity analysis, never asking whether the plaintiff's allegations, if accepted as true, stated a claim upon which relief could be granted.
 
 
 28
 For all of these reasons, we simply are unable to agree with our sister circuits that Siegert represents a significant modification of the official immunity doctrine of Harlow.
 
 3.
 
 29
 The courts of appeals have not explained precisely why they read Siegert as they do. It appears, however, that all of the different readings are ascribable to an exclusive focus on four isolated statements that appear in Siegert, without regard either to the context in which those statements appear or to the context in which the case arose. The courts reading Siegert as requiring a Rule 12(b)(6) inquiry within or prior to the qualified immunity analysis seem to focus on the following two statements: First,
 
 
 30
 [Siegert's] allegations, even if accepted as true, did not state a claim for violation of any rights secured to him under the United States Constitution.
 
 
 31
 Siegert, 500 U.S. at 227, 111 S.Ct. at 1791; see also id. at 233-34, 111 S.Ct. at 1794 ("The facts alleged by Siegert cannot ... be held to state a claim for denial of a constitutional right."); and second,
 
 
 32
 A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.
 
 
 33
 Id. at 232, 111 S.Ct. at 1793. Those courts that conclude that Siegert requires a merits review seize upon a third statement, that "Siegert failed not only to allege a violation of a constitutional right that was clearly established at the time of Gilley's actions, but he failed to establish the violation of any constitutional right at all." Id. at 233, 111 S.Ct. at 1794 (emphasis added). The fourth misconstrued statement, which is a source of support for both groups of courts, is that,
 
 
 34
 "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.... Until this threshold immunity question is resolved, discovery should not be allowed."
 
 
 35
 Id. at 231, 111 S.Ct. at 1793 (alterations in original) (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738).
 
 
 36
 When the first and second statements are read in the context in which they appear in Siegert, and with an understanding of the Court's qualified immunity jurisprudence, it is clear that the Court did not intend by either statement to require a determination under current law of whether the plaintiff has stated a claim in the Rule 12(b)(6) sense, before determining whether the plaintiff alleged a violation of a right clearly established at the time the actions occurred.
 
 
 37
 If the Court had intended the first statement to reference a Rule 12(b)(6) inquiry, presumably it would not have said in the same sentence that the plaintiff's failure to state a claim represented a failure at "an analytically earlier stage of the inquiry into qualified immunity," id. at 227, 111 S.Ct. at 1790, because the qualified immunity inquiry, unlike the Rule 12(b)(6) inquiry, is concerned only with the law at the time of the defendant's actions. That it did not intend to impose any such new requirement is confirmed by the Court's restatement of its holding in the analytical portion of its opinion: "We hold that the petitioner in this case failed to satisfy the first inquiry in the examination of such a claim; he failed to allege the violation of a clearly established right." Id. at 231, 111 S.Ct. at 1793.[4]
 
 
 38
 If the Court had imposed a separate Rule 12(b)(6) inquiry through the second of these statements, it would not have referred to this inquiry and the qualified immunity inquiry as "necessar[ily] concomitant." While arguably the determinations would be "concomitant," they certainly would not be "necessar[ily] concomitant," because, as noted supra, each inquiry focuses upon the law at a different time. In invoking the notion of concomitance, the Court was simply making the self-evident point that a plaintiff has not alleged the violation of a right clearly established at the time of the conduct, if he has not alleged the violation of a right that existed at that time. The Court was not creating an inquiry of two distinct parts, as has been supposed;[5] rather, it was merely observing the tautology, in attempted explication, that a right cannot be "clearly" established if it does not even exist.
 
 
 39
 This perhaps would have been clearer if the Court had not, in the four sentences immediately preceding its reference to the concomitance of the two inquiries, invited this very confusion. First, the Court stated that the court of appeals had assumed that bad faith would render the defendant's actions a violation of the Constitution, without making explicit that this was a violation of the law at the time of the defendant's conduct. The Court then referred to the question of whether the defendant's actions would have been a violation as the "preliminary issue." And then the Court apparently equated this "preliminary" issue with the "threshold immunity question" referenced in Harlow. See Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. There is no question, however, that the "threshold question" in Harlow was whether the plaintiff had alleged the violation of a law that was clearly established at the time the action occurred, not whether he had alleged the violation of a right that existed (however clearly) at the time the suit was filed. See Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. Of course, it is the Supreme Court's equating of the "preliminary issue" of whether a violation was stated with Harlow 's "threshold question" that ultimately proves that the court of appeals' error was in assuming that a violation of clearly established law was asserted, and not merely in assuming that a violation was asserted under current law.
 
 
 40
 At bottom, it appears that each of these first two statements has been misread largely because the courts have failed to appreciate that the Court routinely frames its qualified immunity inquiry as one into whether the plaintiff's allegations "state a claim" or "allege the violation of a right," when it is asking whether the plaintiff has asserted the violation of a right that was clearly established at the time of the defendant's actions. In other words, the Court often uses these phrases as shorthand for the qualified immunity analysis required by Harlow, Mitchell, Anderson, and other pre-Siegert cases. In Mitchell, for example, the Court observed that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. Indeed, Siegert itself used the phrase "failed to allege" in a context where there is no question that the Court was referencing the law at the time of the event, not current law. See Siegert, 500 U.S. at 231, 111 S.Ct. at 1793 (holding that defendant is entitled to qualified immunity because plaintiff "failed to allege the violation of a clearly established constitutional right"). The Court's reference to "clearly established law" in both of these passages removes any doubt that the "failure to allege" locution is not an implicit allusion to a Rule 12(b)(6) analysis, because, as noted supra, the phrase "clearly established law" has an acquired meaning in the qualified immunity context referencing law at the time of the challenged conduct.
 
 
 41
 For the same reasons that the Court could not have been requiring a Rule 12(b)(6) inquiry, with resort to current law, we have no doubt that it was not requiring a merits review when it said in the third statement that qualified immunity was warranted because the plaintiff "failed to establish the violation of any constitutional right at all." Id. at 233, 111 S.Ct. at 1794. Siegert itself all but confirms the error of this interpretation when, on the previous page, it makes the identical point, but phrases it in terms of the plaintiff's failure to "assert [ ] a violation of a constitutional right at all." Id. at 232, 111 S.Ct. at 1793 (emphasis added).
 
 
 42
 Finally, when the fourth statement is read in the context in which it appeared in Harlow, it is likewise clear that the Court was not in any way suggesting that current law dictates the resolution of the qualified immunity question. The full quotation from Harlow is as follows:
 
 
 43
 On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed.
 
 
 44
 Harlow, 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). When the statement is read in its full context, it is evident that the "threshold immunity question," appearing in the last sentence was a reference to the inquiry into "the law at th[e] time" of the occurrence of the action, which is discussed in the second sentence, not to the "currently applicable law" mentioned in the first sentence. This is all but lost when the second sentence from the block quotation is omitted, as it usually is by courts interpreting Siegert, and as it was in Siegert itself. There is no reason to believe, however, that the Court in Siegert meant by this language anything different than did the Court in Harlow. The reference to "currently applicable law" appears to have been included only to contrast the qualified immunity inquiry (with its focus on law at the time of the actions) with the typical summary judgment question (with its focus on current law).
 
 III.
 
 45
 Turning to the present case, the district court denied Haines' summary judgment motion because "differences" existed between the parties' factual allegations and discovery was not complete. The court did not address whether, based on DiMeglio's allegations, Haines' conduct violated law that was clearly settled at the time the actions occurred. In failing to resolve this question and permitting discovery to proceed, the district court erred. Had the district court addressed the threshold immunity question, it would have found that Haines was entitled to qualified immunity.
 
 
 46
 When considering whether the plaintiff has asserted a violation a clearly established right, " 'the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.' " Wiley v. Doory, 14 F.3d 993, 995 (4th Cir.1994) (Powell, J.) (quoting Pritchett, 973 F.2d at 312). The "rights must be clearly established under the particular circumstances confronting the official at the time of the questioned action." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir.1991) (Powell, J.) (citing Anderson, 483 U.S. at 640, 107 S.Ct. at 3039); see also Hodge v. Jones, 31 F.3d 157, 167 (4th Cir.1994) (finding the district court's "generalized formulation of a constitutional right" was "a fundamental error"); Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir.1994) ("[T]he right must be clearly established in a particularized relevant sense."); Gooden v. Howard County, Md., 954 F.2d 960, 968 (4th Cir.1992) (en banc ) (" 'The right must be sufficiently particularized to put potential defendants on notice that their conduct is probably unlawful.' " (quoting Azeez v. Fairman, 795 F.2d 1296, 1301 (7th Cir.1986))). In Anderson, the Supreme Court explained why the focus must be upon the right at this level of particularity:
 
 
 47
 [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, Harlow, 457 U.S., at 819 [102 S.Ct. at 2739], assessed in light of the legal rules that were "clearly established" at the time it was taken, id., at 818 [102 S.Ct. at 2738].
 
 
 48
 The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 49
 Anderson contends that the Court of Appeals misapplied these principles. We agree. The Court of Appeals' brief discussion of qualified immunity consisted of little more than an assertion that a general right Anderson was alleged to have violated--the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances--was clearly established. The Court of Appeals specifically refused to consider the argument that it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances. The previous discussion should make clear that this refusal was erroneous.
 
 
 50
 Anderson, 483 U.S. at 639-41, 107 S.Ct. at 3038-39 (alteration in original) (citations omitted). If the right is not defined at an appropriately particularized level, an alleged violation of the law that was existing at the time of the challenged conduct necessarily would be an alleged violation of clearly established law, and the reasonableness of the defendant's conduct would be irrelevant.
 
 
 51
 DiMeglio alleges that Haines violated his First and Fourteenth Amendment rights when Haines retaliated against him for the statements made before the EBIA, by admonishing him for giving legal advice to the citizens' group, by humiliating him in the zoning inspectors' meeting, by instructing him not to testify at the hearing, by telling him he would never be promoted, and, most significantly, by reassigning him to the newly drawn northern Baltimore County region. The Supreme Court's decision in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and cases following, established that a state government employer violates the Constitution if it deprives an employee of a valuable employment benefit in retaliation for the employee's exercise of his constitutionally protected speech. See Huang v. Board of Governors, 902 F.2d 1134, 1140 (4th Cir.1990). Focusing upon the alleged violated right at the appropriately particularized level requires that we ask, as the district court should have, whether it was clearly established in the Fall of 1990, when these actions allegedly occurred, (1) that statements such as those made by DiMeglio before the EBIA were constitutionally protected expressions and (2) that retaliatory conduct in the form of a reprimand and reassignment of responsibilities constituted deprivation of a valuable government benefit.[6]
 
 A.
 
 52
 In 1990, as today, to determine whether a government employee's speech was protected expression entailed striking " 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (alteration in original) (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734), quoted in Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 2896-97, 97 L.Ed.2d 315 (1987) and Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); see also Waters v. Churchill, --- U.S. ----, ----, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (reaffirming the Connick test). We conclude that in at least two respects it was not clearly established that DiMeglio's statement before the EBIA was protected speech.
 
 
 53
 First, DiMeglio's remarks may not have been protected under Connick because he was speaking as an employee, rather than as a citizen. By 1990, the Supreme Court had repeatedly emphasized that the Pickering doctrine developed to protect the right of a public employee "as a citizen, [to] comment[ ] upon matters of public concern." Connick, 461 U.S. at 143, 103 S.Ct. at 1688 (emphasis added). Although the Court had not expressly held that speech uttered within the employee's public capacity was not protected, the Court had distinguished between speaking as a citizen and as an employee, and had focused on speech as a citizen as that for which constitutional protection is afforded. See id. at 147, 103 S.Ct. at 1690 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government...."). Therefore, it was, and is, not clear that when an individual presents himself as speaking in his capacity as a public employee, that his speech is protected. Only a few years before the time of the alleged actions here, the Fifth Circuit actually had held that whether speech is protected under Connick depends upon whether the employee is speaking as an employee or as an interested citizen, see Terrell v. University of Texas Sys. Police, 792 F.2d 1360 (5th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987):
 
 
 54
 Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.
 
 
 55
 Id. at 1362 (citations omitted); see also Holland v. Rimmer, 25 F.3d 1251, 1255-56 (4th Cir.1994) (finding communications made "in the course of carrying out [plaintiff's] legitimate job duties" and "between employees speaking as employees " were not of public concern). DiMeglio readily admits in his complaint that he attended the meeting in question "as a representative of the Zoning Commissioner's Office," J.A. at 12, and made the statements "in the good-faith performance of his public duties," J.A. at 13. Therefore, it is at least questionable whether DiMeglio's comments, spoken within his public role and concerning a matter within the scope of his responsibilities, were protected expressions upon which a retaliation claim could be based. Cf. Connick, 461 U.S. at 147, 103 S.Ct. at 1690 ("We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."). Accordingly, Haines reasonably could have believed that DiMeglio's speech was not protected.
 
 
 56
 Even if DiMeglio was speaking as a private citizen and on a matter of public concern, as he maintained for the first time at argument, it is still not clear that his speech would have been protected, since the interests of the State in preventing disruption of the orderly management of its offices might well have outweighed DiMeglio's interests in expressing himself on the subject and in the manner, time, and place that he did. See Connick, 461 U.S. at 152-53, 103 S.Ct. at 1692-93; Rankin, 483 U.S. at 388, 107 S.Ct. at 2899. Haines could have reasonably believed that DiMeglio's statements, made seemingly with the imprimatur of the Office, yet contrary to his employer's managerial decision as to the Partlett matter, sufficiently disrupted the function of the Office as to outweigh any interests DiMeglio might have had in expressing himself on that subject. A government employer, no less than a private employer, is entitled to insist upon obedience to the legitimate, day-to-day decisions of the office without fear of reprisal in the form of lawsuits from disgruntled subordinates who believe that they know better than their supervisors how to manage office affairs.
 
 
 57
 In sum, regardless of how DiMeglio characterizes his speech before the EBIA, it was not in 1990 (nor is it even now) clearly within the protected expression of a public employee under the First Amendment. Indeed, only infrequently will it be "clearly established" that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a "particularized balancing" that is subtle, difficult to apply, and not yet well-defined. Connick, 461 U.S. at 150, 103 S.Ct. at 1691-92; Jackson v. Bair, 851 F.2d 714, 717 (4th Cir.1988); see Connick, 461 U.S. at 154, 103 S.Ct. at 1694 (" '[W]e do not deem it either appropriate or feasible to attempt to lay down a general standard against which all statements may be judged.' " (quoting Pickering, 391 U.S. at 569, 88 S.Ct. at 1735)); see also Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992) ("In determining whether the law was clearly established, we bear in mind that allegations of constitutional violations that require courts to balance competing interest may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity."); Borucki v. Ryan, 827 F.2d 836, 848 (1st Cir.1987) ("[W]hen the law requires a balancing of competing interest, ... it may be unfair to charge an official with knowledge of the law in absence of a previously decided case with clearly analogous facts.") (citation omitted); Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.) ("[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); Benson v. Allphin, 786 F.2d 268, 276 (7th Cir.) (A constitutional rule that "involv[es] the balancing of competing interests" is "so fact dependent that the 'law' can rarely be considered 'clearly established.' "), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986).
 
 B.
 
 58
 Even if DiMeglio's statements before the EBIA were protected under Connick, it was not clearly established in 1990 that Haines' conduct deprived DiMeglio of a valuable government benefit or caused him adversity rising to the level of a constitutional violation. Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory. See ACLU of Md. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir.1993); Stott v. Haworth, 916 F.2d 134, 140 (4th Cir.1990). In June 1990, a sharply divided Supreme Court held for the first time that an adverse employment action did not have to be the substantial equivalent of a dismissal to violate a public employee's rights under the First Amendment. Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76, 110 S.Ct. 2729, 2737-38, 111 L.Ed.2d 52 (1990). While the Court recognized that a failure to rehire, a denial of promotion, or a denial of a transfer, may constitute a deprivation of a valuable government benefit, see id. at 73-76, 110 S.Ct. at 2736-38, it did not hold, nor had this circuit at that point held, that an employment action less onerous than those amounted to a constitutional deprivation. See Akers v. Caperton, 998 F.2d 220, 226-28 (4th Cir.1993). At most, Haines retaliated by assigning DiMeglio to a geographic subset of the very region from which he formerly had derived his zoning assignments; there was no change in his general duties, pay, benefits, or perquisites of office. Because this action is less severe than those adverse actions recognized by the Supreme Court in Rutan, it was not clearly established in December 1990 that Haines' reassignment of DiMeglio's job responsibilities rose to the level of a constitutional deprivation. The alleged reprimand that Haines directed at all the zoning inspectors was even more innocuous and certainly not clearly an actionable adverse employment action. Even today, the equivalent of Haines' action likely would not be sufficiently adverse to implicate the First Amendment. See ACLU of Md., 999 F.2d at 785-86 (holding that withdrawal of ACLU's paralegal's "contact visits" with inmates, even if retaliatory, was not sufficiently adverse to the ACLU to implicate First Amendment right to petition); Dorsett v. Board of Trustees, 940 F.2d 121, 123 (5th Cir.1991) (finding professor's alleged harms, comprising adverse decisions on teaching assignments, pay increases, and administrative matters, in retaliation for public speech critical of his employer did not rise to the level of a constitutional deprivation).[7]
 
 
 59
 Given that it was not clear as a matter of law that DiMeglio's speech was protected under Connick nor that a reassignment or reprimand was a deprivation of a valuable government benefit, it could not have been apparent under then-existing law that Haines' conduct was unlawful. The district court accordingly erred in not holding that Haines was entitled to qualified immunity.
 
 IV.
 
 60
 Haines asks us to review several additional issues arising from his motion before the district court. In O'Bar v. Pinion, 953 F.2d 74 (4th Cir.1991), we concluded that, when a court reviews an order denying a claim of qualified immunity on an interlocutory appeal, it may, under the doctrine of pendent appellate jurisdiction and in an exercise of discretion, "review all issues that the parties raise and which are reasonably related when that review will advance the litigation or avoid further appeals." Id. at 80. On this reasoning, the court "look[ed] at not only the immediate immunity issue, but beyond to the very related issues of whether the conduct of the defendants denied [the plaintiff his constitutional rights]." Id. The court in O'Bar, however, did not address the Supreme Court's decision in Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), or the majority's opinion in Mitchell, two decisions that draw into question the correctness of O'Bar 's conclusion as to the reviewability of such claims.
 
 
 61
 The general rule, of course, is that the courts of appeals may hear appeals from "final decisions" of the district courts, 28 U.S.C. Sec. 1291, and usually, a denial of summary judgment is not treated as final, and cannot be appealed until the conclusion of a case on the merits. While a "small class" of exceptions, such as that announced in Mitchell v. Forsyth has been permitted, these exceptions arise only where the summary judgment decision "finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); see also Digital Equip. Corp. v. Desktop Direct, Inc., --- U.S. ----, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994). Under this so-called "collateral-order" doctrine, interlocutory appeals from the denial of qualified immunity were permitted, because, as noted above, but for the appeal, the defendant would have to stand trial and qualified immunity should have afforded him immunity from suit. Thus, the decision at summary judgment affects a right separate from and collateral to the rights asserted in the action. In contrast, none of Haines' remaining issues meets the requirements of the collateral-order doctrine.[8]
 
 
 62
 In Abney v. United States, the Supreme Court emphasized, in holding that a court of appeals may exercise jurisdiction over an interlocutory appeal in the criminal context, that the Court did "not hold that other claims contained in the motion to dismiss are immediately appealable as well." 431 U.S. at 662-63, 97 S.Ct. at 2042 (emphasis added). The Court explained:
 
 
 63
 Our conclusion that a defendant may seek immediate appellate review of a district court's rejection of his double jeopardy claim is based on the special considerations permeating claims of that nature which justify a departure from the normal rule of finality. Quite obviously, such considerations do not extend beyond the claim of former jeopardy and encompass other claims presented to, and rejected by, the district court in passing on the accused's motion to dismiss. Rather, such claims are appealable if, and only if, they too fall within Cohen 's collateral-order exception to the final-judgment rule. Any other rule would encourage criminal defendants to seek review of, or assert, frivolous double jeopardy claims in order to bring more serious, but otherwise nonappealable questions to the attention of the courts of appeals prior to conviction and sentence.
 
 
 64
 Id. at 663, 97 S.Ct. at 2042.[9] Citing Abney, we concluded that, when addressing the issue of absolute immunity in an interlocutory appeal, we lacked jurisdiction to review other claims raised below. Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va., 945 F.2d 760, 762-63 (4th Cir.1991) ("[T]he fact that we had jurisdiction over the district court's order regarding absolute immunity did not permit us to review other claims raised below. We could have considered the [other] issue[s] only if [they] fell within the exception to the final-judgment rule set out in Cohen." (citations omitted)), cert. denied, --- U.S. ----, 112 S.Ct. 1477, 117 L.Ed.2d 620 (1992).
 
 
 65
 From these authorities, it might appear that we may not address the remaining claims presented in connection with Haines' appeal on qualified immunity. However, despite the reasoning in Abney and its application in Front Royal, this circuit held in O'Bar and elsewhere that pendent jurisdiction empowers us to consider issues that overlap with the immunity question. See also Rowland, 41 F.3d 167, 175; ACLU of Md., 999 F.2d at 784, 787. Our jurisdiction, therefore, is not precluded, but discretionary. Nevertheless, "taking into consideration factors of judicial economy, injudicious intermeddling, and justice in the disposition," O'Bar, 953 F.2d at 80, we decline in our discretion to address the remaining claims that Haines raises on this interlocutory appeal.
 
 CONCLUSION
 
 66
 The order of the district court denying summary judgment for Haines on qualified immunity grounds is vacated. The case is remanded to the district court with instructions to enter summary judgment for Haines on DiMeglio's section 1983 claim.
 
 
 67
 VACATED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 Only if a court determines that the plaintiff has alleged a violation of a right clearly established at the time the actions occurred should it proceed to determine whether a reasonable person in the official's position would have known that his actions violated that right. When the inquiry proceeds to this point, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct," Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738; however, the defendant may still be able to show "extraordinary circumstances" and "prove that he neither knew nor should have known of the relevant legal standard." Id. at 819, 102 S.Ct. at 2738. Since such a claim would turn "primarily on objective factors," id., this determination, too, is "also a matter of law for the courts," Collinson v. Gott, 895 F.2d 994, 998 (4th Cir.1990)
 
 
 [2]
 The distinctions between these first two categories of courts that read Siegert as introducing a new requirement of a Rule 12(b)(6) inquiry are often elusive on whether the new inquiry is a part of the qualified immunity analysis or independent of that analysis. A number of the opinions can even be read as internally inconsistent on this question. Compare Wilson, 42 F.3d 1060, 1064-65 ("If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of a constitutional right, then the defendant is entitled to qualified immunity."), with id. at 1064 ("[B]efore we even reach the immunity claim, the plaintiff's complaint must state a claim on which relief may be granted."); compare Grady, 979 F.2d at 1113 ("Our first step when reviewing the denial of qualified immunity is whether plaintiff has stated a claim for the violation of federal rights."), with id. at 1114 ("Because Grady's complaint states a violation of federal rights, we turn to the question of whether Grady has met his burden on summary judgment of showing that [the defendant's] conduct does not entitle her to qualified immunity."); compare Duckett, 950 F.2d at 277 (" '[T]he Supreme Court has recognized the question of failure to state a claim as "an analytically earlier stage of the inquiry into qualified immunity" ....' " (citations omitted)), with id. at 279 ("We find that Duckett ... has stated a constitutional challenge.... We now turn to the issue of defendants' entitlement to qualified immunity ...." (emphasis in original))
 
 
 [3]
 In his brief, the respondent argued only in a footnote that no violation of a clearly established right existed at the time the actions took place, adding that that issue was not before the Court. See Brief for the Respondent at 26 n. 16, Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (No. 90-96). The petitioner similarly addressed only briefly the question of whether he had alleged the existence of a clearly established constitutional right, and only whether that right existed at the time the alleged unconstitutional actions took place. See Brief for the Petitioner at 17-19, Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (No. 90-96)
 
 
 [4]
 There are even more subtle indications throughout Siegert that, even though the Court did not specifically recite the phrases "clearly established law" and "at the time of defendant's actions" each time those phrases would have been relevant, throughout the opinion it was inquiring into whether the plaintiff had stated a violation of law clearly established at the time of the defendant's actions. For example, although the Court stated at one point that the lower court's error was in assuming that the plaintiff had stated "a violation of [his] constitutional rights" (arguably under current law), see Siegert, 500 U.S. at 232, 111 S.Ct. at 1793, the first time it characterized this error, the Court actually inserted in brackets the term "clearly established," see id. at 230, 111 S.Ct. at 1792 ("Assuming" that proof of malice " 'would suffice to make Gilley's actions in writing the letter a violation of Siegert's [clearly established] constitutional rights.' " (brackets added by Supreme Court in Siegert) (quoting Siegert, 895 F.2d at 803)). This insertion presumably was thought necessary in order to clarify that the Court was addressing the clarity of the law at the time of the actions, even if the court of appeals mistakenly had not addressed this issue. Similarly, in discussing the facts, the Court noted that the district court had denied Gilley's "qualified immunity claim" on the ground that "Siegert's factual allegations were sufficient to state violations of a clearly established constitutional right." Id
 
 
 [5]
 The courts that have concluded otherwise undoubtedly have been confused by the Court's earlier reference to a "first inquiry," Siegert, 500 U.S. at 231, 111 S.Ct. at 1793, in the consideration of a qualified immunity claim, in addition to the Court's reference to "concomitant" inquiries. The Court's reference to the "first inquiry," however, was to whether the plaintiff has "allege[d] the violation of a clearly established constitutional right," not to whether the plaintiff has stated a claim or can win on the merits. Id. The succeeding steps of the qualified immunity inquiry, of course, concern the truth of the plaintiff's factual allegations and the objective reasonableness of the officer's belief as to the state of the law. See Anderson, 483 U.S. at 646-47 n. 6, 107 S.Ct. at 3042 n. 6; Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39
 
 
 [6]
 Of course, as part of a retaliatory claim, the plaintiff must also allege the requisite causation between the statements made and the retaliatory conduct. See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). See also note 7 infra
 
 
 [7]
 Because neither the first nor second element of a First Amendment retaliation claim was met, we need not address the third element, which requires that the plaintiff establish causation. See Berger v. Battaglia, 779 F.2d 992, 998 (4th Cir.1985) ("Public employee speech not on matters of 'public concern' simply enjoys no protection against employer disciplinary action ...."), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986); ACLU of Md., 999 F.2d at 785 ("Where there is no impairment of the plaintiff's right, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.")
 
 
 [8]
 To be immediately appealable, an order must (1) be effectively unreviewable on appeal from a final judgment; (2) conclusively determine the disputed question; and (3) resolve an important issue completely separate from the merits of the action. Mitchell, 472 U.S. at 527-28, 105 S.Ct. at 2816-17
 
 
 [9]
 That the limitation announced in Abney applies equally in the context of qualified immunity is a reasonable inference, since the Supreme Court relied on the general holding in Abney--that a denial of a defendant's claim of a right not to stand trial on double jeopardy grounds is immediately appealable--to find a denial of qualified immunity is immediately appealable in Mitchell v. Forsyth. Mitchell, 472 U.S. at 525, 527, 105 S.Ct. at 2814-15, 2816