1/4/96 -- order filed granting rehearing in banc.
Published opinion filed 11/16/95 is vacated.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JEANETTE TEEL TAFT, individually
and as guardian ad litem for minor
children, Onte Taft and Kimberly
Taft; ONTE TAFT, minor; KIMBERLY
TAFT, minor; HARRY TEEL, SR., as
guardian ad litem for minor
children, Harry Teel, Jr., and
Shamesa Teel; HARRY TEEL, JR.,
minor; SHAMESA TEEL, minor,
Plaintiffs-Appellants,

v.

TERRY VINES, Deputy Sheriff of Pitt
County, in his position as Deputy
Sheriff and in his individual
capacity; TROY BOYD, in his official                    No. 94-2293

and individual capacity as a law
enforcement officer in and for the
City of Greenville; TIM PEADEN, in
his official and individual capacity
as a law enforcement officer in and
for the City of Greenville; JOHNNY
CRAFT, in his official and individual
capacity as a law enforcement
officer in and for the City of
Greenville; BENNY DOBBS, in his
official and individual capacity as a
law enforcement officer in and for
the City of Greenville,
Defendants-Appellees,

and

BILLY L. VANDERFORD, Sheriff of
Pitt County in his capacity as
Sheriff and in his individual
capacity; CITY OF GREENVILLE;
NANCY JENKINS, Mayor, in her
official and individual capacity;
CHARLES HINMAN, Chief of Police,
City of Greenville, in his official
capacity; KEVIN M. SMELTZER,
Police Officer of the City of
Greenville, in his official and
individual capacity,
<u>Defendants.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
James C. Fox, Chief District Judge.
(CA-93-109-4-F)

Argued: May 2, 1995

Decided: November 16, 1995

Before MURNAGHAN and MOTZ, Circuit Judges, and YOUNG,
Senior United States District Judge for the District of Maryland,
sitting by designation.

_____

Affirmed in part and reversed in part by published opinion. Judge
Murnaghan wrote the opinion, in which Senior Judge Young joined.
Judge Motz wrote an opinion concurring in part and dissenting in
part.

_____

**COUNSEL**

**ARGUED:** Robert Lee White, WHITE & SHEARIN-WHITE,
Greenville, North Carolina, for Appellants. Kenneth Ray Wooten,

John Randolph Green, Jr., WARD & SMITH, P.A., New Bern, North Carolina, for Appellees.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

The case before us presents issues arising from allegations by Appellants, Jeanette Teel Taft, Onte Taft, Kimberly Taft, Harry Teel, Jr., and Shamesa Teel, that they were harassed by local law enforcement officials in violation of their civil rights, when their car was mistakenly stopped and searched in Greenville, North Carolina. On July 30, 1993, the Appellants filed a <u>pro se</u> complaint in the United States District Court for the Eastern District of North Carolina, alleging violations of 28 U.S.C. §§ 1331, 1343, 1651, and 2201, and of 42 U.S.C. § 1983. The Appellants filed an amended complaint on August 20, 1993 adding a Fifth Amendment due process claim. The named defendants at that initial stage of the litigation were the Sheriff of Pitt County, North Carolina; a Deputy Sheriff of Pitt County; the City of Greenville, North Carolina through its Mayor, Nancy Jenkins; the Chief of Police of the City of Greenville; and the six individual Greenville police officers personally involved in the vehicular stop, the Appellees here.

On September 13, 1993, the defendants filed a motion to dismiss the case pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. By an order dated October 22, 1993, the district court dismissed all of the Appellants' claims except for their § 1983 claims. The district court also gave the Appellants an opportunity to file another amended complaint to describe more particularly the alleged conduct of each of the named defendants. Additionally, the district court ruled that the remaining § 1983 claims against the defendants in their individual capacities for money damages, and in their official capacities for injunctive relief, would be held in abeyance pending the expiration of the 20 days within which the Appellants could amend their complaint.

The Appellants filed a second amended complaint on November 5, 1993. By an order dated December 13, 1993, the district court held

that the amended claim sufficiently stated claims of excessive force against the six police officers in their individual capacities for monetary damages, and that the motion to dismiss was therefore denied as to them. However, the court dismissed the claims against Sheriff Billy Vanderford, the City of Greenville, Mayor Jenkins, and Police Chief Charles Hinman, and held that any claims for injunctive relief were also dismissed.

On May 2, 1994, the six remaining defendants -- Terry Vines, Kevin Smeltzer, Tim Peaden, Benny Dobbs, Johnny Craft, and Troy Boyd ("Appellees") -- filed a motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, alleging entitlement to qualified immunity. On May 18, 1994, the Appellants filed a motion for continuance, asking for an order postponing the hearing on the partial summary judgment motion until such time as the Appellants had taken depositions, interrogatories, and requests for admissions from the Appellees regarding their qualified immunity defense. On that date, the Appellants also filed a memorandum in response to the Appellees' motion for partial summary judgment. On May 23, 1994, the district court filed an order allowing the Appellants' motion to compel discovery for production of certain documents which had been filed on February 16, 1994, <u>but stayed all other discovery until it ruled on the motion for partial summary judgment</u>; the court held that its order staying discovery therefore rendered moot the Appellants' earlier motion for continuance.

By order filed July 8, 1994, the district court granted the Appellees' motion for summary judgment as to certain of the claims arising from their execution of the actual stop and search. However, the district court further found that the Appellants had not sufficiently responded to the motion for partial summary judgment, and thus directed the Appellants to file, within 15 days, a brief and memorandum of law, supported by proper affidavits or other competent documentation, particularizing (1) their allegations of sexual abuse of the minor Appellants, and (2) their charges that the Appellees cocked and clicked loaded weapons against the minor Appellants' heads.

On July 25, 1994, the affidavits were filed. By order filed August 5, 1994, the court denied the Appellees' motion for partial summary judgment as to their conduct in frisking the Appellants, as to whether

4

such conduct amounted to sexual abuse, and as to the various gun-pointing allegations. On August 5, 1994, the Appellees filed an objection to the affidavits and to the Appellants' memorandum of law. On August 9, 1994, the court filed an order that superseded and withdrew its previous August 5 order, and <u>granted</u> the Appellees' motion for summary judgment on qualified immunity as to all of the § 1983 claims, thereby disposing of all of the issues in the case against the Appellees.**1**

_____

**1** The dissenter would return us a hundred years or so to say that language must be excessively parsed and accorded an unrealistically restricted interpretation to reach the conclusion that there was no material dispute of relevant fact. Here the district judge had first refused to grant qualified immunity, but thereafter required the Appellants adequately to support by affidavits or otherwise the allegations of sexual abuse and of cocking and clicking loaded weapons against the minors' heads. Jeanette Teel Taft's verification of the second amended complaint had been deemed inadequate, not as to assertions made, but as not being shown to have been based on personal knowledge. However, her affidavit cured that insufficiency. That brought the case directly into the holding in <u>Johnson v. Jones</u>, 115 S. Ct. 2151, 2159 (1995) (". . . a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a`genuine' issue of fact for trial").

The verified amended complaint had been deemed sufficient to establish that the allegations took "defendants' actions well outside the realm of objective reasonableness under the circumstances." The district judge, however, required affidavits that detailed the basis of "personal knowledge" of sexual abuse and cocking and clicking loaded weapons against the children's heads. The sufficiency of the allegations in the amended complaint had previously been acknowledged, and they were verified (<u>i.e.</u>, under oath). Their insufficiency was said to be lack of personal knowledge. Jeannette Teel Taft's affidavit when added to the allegations in the amended complaint made them sufficient for defeating summary judgment purposes (they already had been deemed sufficient for pleading purposes). She by affidavit claimed personal knowledge of the sexual abuse and improper cocking and clicking as stated in the amended complaint because, by affidavit, during the entire stop she had an unobstructed view of the children from her vantage point in the patrol car (<u>i.e.</u>, personal knowledge).

5

On August 19, 1994, the Appellants filed a "motion for a new trial or to amend findings and judgment" pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. The court denied that motion on September 14, 1994. The Appellants filed a notice of appeal on September 30, 1994.

On appeal, the Appellants put forth two arguments: (1) that the district court erred in finding that there existed no genuine issues of material fact as to the Appellees' entitlement to qualified immunity; and (2) that the district court erred in denying the Appellants' motion to continue the summary judgment hearing until discovery on the issue of qualified immunity was completed. We affirm the district

_____

The affidavits which the Appellants in response did produce further contained assertions by Jeanette Teel Taft that her breasts, buttocks, and the private parts between her legs were touched. Similar affidavits were produced by the minor Appellants. While cocking and clicking was sworn to, the touching of the minors' heads went unmentioned. However, handcuffing of the minor Appellants, after frisking and finding no weapon, was. Why was it incumbent on the Appellants to make the same sworn statement based on personal knowledge more than once?

How the breasts, buttocks and private parts were touched is not particularized one way or the other in the affidavits though they were in the verified second amended complaint of which personal knowledge had subsequently been established. The language employed in the affidavits and the second amended complaint expanded by them would support a factual finding of sexual harassment. Similarly, a finding of excessive force (again the Jeanette Teel Taft second amended complaint verification is strengthened by her affidavit) could follow from proof of cocking and clicking even if the weapons were not allowed by an inch or more actually to touch the minor appellants' heads.

Immunity is necessary for police officers properly conducting what are often dangerous tasks, but the public is too entitled to some protection from the law. To find, so early in the proceedings as a matter of law, that the verified allegations here could not establish improper conduct amounting to sexual harassment or excessive force would incorrectly limit the right of a party to plead and prove his or her case. On summary judgment the non-moving party's case is viewed in the most favored light.

6

court's decision to grant summary judgment as to those claims arising from the Appellees' _actual decision_ itself, based on reasonable suspicion, to stop the vehicle and frisk its occupants, but reverse the district court's decision to grant summary judgment as to the claims that the Appellees used excessive force in _conducting_ the actual search. We also reverse the district court's decision in effect denying the Appellants' motion for continuance by staying discovery until it had ruled on the Appellees' motion for summary judgment.

## I. Statement of Facts

On January 29, 1993, Vincent Wooten ("Wooten") shot and wounded a person with whom he had a disagreement. Wooten was charged with assault with a deadly weapon and with intent to kill, but was released on bond. On February 9, 1993, Wooten shot and killed another individual, Maurice Wilson, while on release. The police began a search for Wooten immediately thereafter.

On February 9, 1993, at approximately 10:25 p.m., Appellant, Jeanette Teel Taft, an African-American female, was driving with her children, Appellants, Onte Taft and Kimberly Taft, and her niece and nephew, Appellants, Shamesa Teel and Harry Teel, Jr., all minors. They were travelling in Greenville, North Carolina in a light blue Oldsmobile, on their way from a basketball game. The minor Appellants were ages 10 to 16.

At that time, the Appellees were requested over the police radio to stop the Appellants' car. The reason was that the vehicle was believed to carry Wooten. The radio request was based on the fact that the Appellants' car had left the same mobile home park in which Wooten resided.

As the Appellants' car turned from Green Street onto Highway 33, the police officers, Appellees Terry Vines, Kevin Smeltzer, Troy Boyd, Tim Peaden, Johnny Craft, and Benny Dobbs, initiated the stop of the vehicle. In response, Jeanette Taft stopped the car at the side of the road.

Appellee Dobbs, over the P.A. system, ordered Jeanette Taft to throw her keys onto the road. She did so. Dobbs also ordered each

individual in the car, including the minor Appellants, to get out of the car with their hands up. Jeanette Taft was the first to step out of the vehicle; Taft stated in her affidavit that, as she tried to get out of the car, the Appellees clicked and cocked the barrels of their police weapons.

Jeanette Taft's son, Appellant Onte Taft, was next to get out of the car. Appellee, Lieutenant Vines, who had previously seen Wooten, conceded in his affidavit that he realized as soon as Onte Taft walked toward the police, that Onte was <u>not</u> Vincent Wooten.

By their own admission, the police officers had their guns drawn at this time, and pointed toward to the car. Their explanation for this behavior was that they feared that if Wooten was still in the car, bullets from his assault rifle would be able to pierce their bullet-proof vests. In their affidavits, the Appellees stated that as each minor exited the car, they lowered their weapons to let them pass; the Appellees claimed that they resumed aiming their guns at the car only after the minors were out of the line of fire. The minor Appellants, by contrast, stated in their affidavits that the officers did not lower their guns as they exited the car, that the officers had their guns drawn and pointed at them at all times, and that the officers cocked and clicked the weapons in an intimidating manner. The minor Appellants additionally stated in their affidavits that they were handcuffed and searched, and that the Appellees clicked the guns against their heads. In contrast, the officers, in their affidavits, claimed never to have made any cocking or clicking sounds with their guns which may have scared the Appellants.

Meanwhile, Jeannette Taft had advised the Appellees that she was the mother of two of the minors, that they had just come from a basketball game, and that she was driving on Highway 33 for the sole purpose of dropping off her son's friend, Shawn Tyson, at his home. Despite her explanation, both Jeanette Taft and Onte Taft were frisked and handcuffed. Jeanette Taft alleged that during that pat-down search, she was sexually abused; in particular, she stated that the officer conducting the search touched her breasts and buttocks, and that he inappropriately touched her between her legs and on her "private parts." She also stated that she observed similar physical

8

touching of the minor Appellants. In contrast, the officers claimed in their affidavits that they at no time sexually abused the Appellants.

By their own admission, the police officers, even after frisking the Appellants and finding no weapons, placed Jeanette Taft in the back-seat of a patrol car with the handcuffs in front of her, and placed Onte Taft, handcuffed and on his knees, on the road facing the headlights of a patrol car. They claimed that such "inconveniences" were undertaken to protect the officers, to prevent the Appellants from assisting Vincent Wooten to escape, and to protect the Appellants in case Wooten opened fire. In fact, Wooten was not present in the car.

After all of the Appellants had exited the vehicle, Appellees Dobbs and Craft approached the light blue Oldsmobile and conducted a visual search for Wooten. They confirmed that Wooten was not in the vehicle, and the Appellants were thereafter released. A short time later, Wooten was captured in another vehicle, a black Sterling, driven by Wooten's father.

II. Grant of Summary Judgment on Issue of Qualified Immunity

First, the Appellants allege that the district court erred in granting summary judgment to the Appellees on the basis of qualified immunity[2]

_____

[2] As a preliminary matter, the Appellees allege that the Appellants have appealed only from the district court's denial of their Rule 59(a) "motion for a new trial or to amend the findings and judgment," and that this Court should therefore refuse to review the district court's Rule 56 summary judgment determinations on qualified immunity. Several consider-ations, however, suggest that the district court's summary judgment determinations should be reviewed on appeal.

First, the Appellants' notice of appeal stated expressly that the Appel-lants were appealing "from the decision by the court granting defen-dant's motion for summary judgment entered in this action on the 14th day of September, 1994." (emphasis added). Thus, although the order entered on September 14th was the district court's denial of the Rule 59(a) motion, the actual language of the notice of appeal clearly evi-dences that the Appellants meant to appeal the district court's summary judgment determination, and not the Rule 59(a) determination. To ignore this would be to lend an excessively formalistic construction to the notice

9

In particular, the Appellants contend: (1) that there existed genuine issues of material fact concerning whether the police were entitled to qualified immunity on the stop and frisk claim; and (2) that there existed genuine issues of material fact as to whether the police were entitled to qualified immunity on the excessive force claims. Although the Appellees' original decision to stop the Appellants' car was clearly supported by reasonable suspicion, thus suggesting that the officers were entitled to qualified immunity on the claims arising from the Appellees' decision to stop and frisk, the record just as clearly evidences the existence of genuine disputes of material fact concerning the reasonableness of the police officers' conduct for purposes of the excessive force claims. Accordingly, we (1) affirm the district court's grant of summary judgment on the basis of qualified immunity as to the claims arising from the officers' initial decision to stop the car and frisk the occupants, but (2) reverse the district court's grant of summary judgment based on qualified immunity to the Appellees on the excessive force claims. We therefore remand for trial only the excessive force claims.

A. <u>Qualified Immunity on the Stop and Frisk Claim</u>

The Fourth Circuit has definitively held that the qualified immunity doctrine protects police officers who mistakenly make an arrest, so long as that arrest is supported by probable cause. Because those

_____

of appeal which would circumvent the true intent of the Appellants. <u>See</u> <u>Brookens v. White</u>, 795 F.2d 178, 180 (D.C. Cir. 1986) (finding that a mistake in designating the judgment appealed from should not result in loss of appeal so long as an intent to appeal can be inferred). Second, the proceedings below were initiated <u>pro se</u> by the Appellants, and although they eventually retained counsel, some leeway should be afforded to them here in the interest of justice. <u>See, e.g., Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1978), <u>cert. denied</u>, 439 U.S. 970 (1978) (finding that <u>pro se</u> complaints should be construed liberally). Third, the Appellants' Brief clearly evidences their intent to appeal the district court's summary judgment determinations, and not its denial of the Rule 59(a) motion. <u>See Foman v. Davis</u>, 371 U.S. 178, 181 (1962) (finding that although the form of a notice of appeal may be "inept," it is sufficient to appeal an order where the appellant's intent to appeal that order is "manifest").

cases logically suggest that qualified immunity should similarly be afforded to police officers who make vehicular stops, so long as those stops are supported by reasonable suspicion, we affirm the district court's grant of summary judgment to the Appellees on the § 1983 claims arising from their initial decision to execute the vehicular stop; because the stop and frisk was supported by reasonable suspicion, qualified immunity was properly afforded to the Appellees.

In Pritchett v. Alford, 973 F.2d 307 (4th Cir. 1992), we addressed a case in which a wrecker driver brought a § 1983 action against high-way patrolmen, alleging that the patrolmen had arrested him without probable cause for allegedly violating South Carolina laws governing the solicitation of towing businesses by wrecker companies. We held that qualified immunity was properly denied to the police officers in that case, setting forth the now familiar three-part test for determining entitlement to qualified immunity:

> Ruling on a defense of qualified immunity [ ] requires (1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then deter-mining whether a reasonable person in the officer's position would have known that doing what he did would violate that right. The first two of these present pure questions of law for the courts. The third, which involves application of Harlow's objective test to the particular conduct at issue, may require factual determinations respecting disputed aspects of that conduct.

973 F.2d at 312. In applying the first and second prongs of the test, we found that the proper focus is upon ascertaining the constitutional right not at its most general or abstract level, but rather determining the right at the level of its application to the specific conduct being challenged. Id. In elucidating the third prong, we held that the deter-mination of the reasonableness of the action taken must be made on the basis of information actually possessed by the officer at the criti-cal time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions. Id. Additionally, in describing how

11

such determinations should be reviewed when the qualified immunity claim is made at the summary judgment stage, we found:

> Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged.
>
> This does not mean, however, that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense, important as may be its early establishment. Here, as in any context, summary judgment for the movant is appropriate only if (1) there are no genuine issues of material fact, and (2) on the undisputed facts the defendant as movant is entitled to judgment as a matter of law. As indicated, the narrow threshold question whether a right allegedly violated was clearly established at the appropriate level of inquiry and at the time of the challenged conduct is always a matter of law for the court, hence is always capable of decision at the summary judgment stage. Whether the conduct allegedly violative of the right actually occurred or, if so, whether a reasonable officer would have known that conduct would violate the right, however, may or may not be then subject to determination as a matter of law. If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial.

Id. at 313 (emphasis added). Under that analysis, we found that the officers were not entitled to qualified immunity in that case because: (1) the right not to be arrested without probable cause was clearly established; and (2) a reasonably competent officer in the defendant's position would have known that charging the driver would violate that right. Id. at 314-15. See also Anderson v. Creighton, 483 U.S. 635 (1987).

Similarly, in Mensh v. Dyer, 956 F.2d 36 (4th Cir. 1991), we addressed a case in which a homeowner brought a § 1983 action when he was mistakenly detained by an arrest team in the middle of the

12

night. 956 F.2d at 37. In holding that the police officers should have been afforded qualified immunity at the summary judgment stage, this Court held that the officers were entitled to summary judgment if they could establish that reasonable officers "could have believed that their actions were lawful in light of both clearly established law and the information the officers possessed at the time." Id. at 39. In so holding, the Court explicitly found that an arrest based on probable cause does not violate the Fourth Amendment even if the wrong person is arrested. Id. Applying that principle to the case, the Court held that because the police were executing a facially valid warrant, their actions were supported by probable cause, and that they were thus entitled to qualified immunity. Id. at 40.

Applying those principles to the case at bar, it is clear that the Appellees here were entitled to qualified immunity as to the § 1983 claims arising from their actual decision to stop Appellant Taft's car and to frisk the occupants. Indeed, although the case law described above deals expressly with probable cause arrests, the principles set forth therein apply equally to vehicular stops under the reasonable suspicion standard. Several considerations compel an affirmance here.

First, the law is well settled that a vehicular stop is justified where the police officers have a reasonable suspicion of criminal activity based on articulable facts. Pennsylvania v. Mimms, 434 U.S. 106 (1977) (finding that a vehicular stop and frisk of the car's occupants is governed by the reasonable suspicion standard set forth in Terry v. Ohio, 392 U.S. 1 (1968)); United States v. Taylor, 857 F.2d 210, 213 (4th Cir. 1988) (finding that a brief investigative stop of a vehicle is permissible when the investigating officers have a reasonable suspicion grounded in articulable facts that the person stopped is involved in criminal activity). In the instant case, the police officers were expressly directed over the radio to stop the Appellants' car because it was believed that the car was carrying the suspected murderer, Wooten. Thus, the reasonable suspicion standard was certainly met since the Appellees' decision to stop the car was based expressly on an order from police headquarters. See United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987), cert. denied , 484 U.S. 965 (1987) (finding that a call made by a dispatcher suggests the existence of reasonable suspicion, and finding that a police officer is not constitutionally required to be "certain" that a crime has occurred when he makes

13

a stop). Indeed, as noted by the Appellees, to have refused to act on the radio dispatch order to stop the car, would have been to be negligent in their duties.

Second, in light of the fact that the stop itself was certainly supported by reasonable suspicion, the police officers were entitled to qualified immunity on any claim alleging that such a stop violated the Appellants' Fourth Amendment rights against unreasonable seizures. Indeed, in conducting the three-step qualified immunity analysis set forth by the Supreme Court and followed by this Circuit in <u>Pritchett, supra</u>, it is clear that the district court did not err. Under the first two prongs of the qualified immunity analysis, it is plain that the specific right in question -- the right not to be stopped and frisked without reasonable suspicion -- was indeed clearly established at the time of the alleged violation. <u>See, e.g., Pennsylvania v. Mimms, supra</u>. The third prong of the qualified immunity analysis, however -- whether reasonable people in the officers' position would have known that doing what they did would violate that right -- was not met here. Indeed, this Court held in <u>Pritchett</u> that such a reasonableness determination must be made on the basis of information <u>actually</u> possessed by the officers at the critical time, or that was then reasonably available to them, and in light of any exigencies of time and circumstance that reasonably may have affected the officers' perceptions; in the instant case, the information actually possessed by the officers at the time of the stop was that the radio dispatcher had suspected that the Appellants' car carried Wooten, and the exigencies of the circumstances compelled them to act immediately before the car could get away. Thus, a reasonable officer in those circumstances would have certainly felt justified in stopping the car on such information.

Third, in <u>Pritchett</u>, it was held that applying the third prong of the qualified immunity analysis at the summary judgment stage may be inappropriate "[i]f there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances." 973 F.2d at 313. In the instant case, however, there is no dispute as to the actual conduct of the officers in making <u>the initial decision to stop the car and to frisk the occupants</u>; the Appellants do not contest on appeal that the officers stopped the car <u>because</u> they were told to do so by the radio dispatcher, or that the stop was executed in a genuine effort to search for Wooten. Nor do the Appellants

14

effectively challenge the district court's conclusion that stopping a car in response to a police dispatch call is generally supported by reasonable suspicion.

Last, it is irrelevant for qualified immunity purposes that Wooten was not _actually_ hiding in the Appellants' car. Indeed, this Court held in <u>Mensh v. Dyer, supra</u>, that the mistaken seizure of an individual is not pertinent to a proper qualified immunity analysis. Indeed, it is precisely in such a case of genuinely mistaken identity that the doctrine of qualified immunity is designed to protect police officers from civil liability.

For the foregoing reasons, the district court did not err in finding that the police officers were entitled to qualified immunity with respect to the Appellants' claim that the actual decision to stop the Appellants' car was violative of their civil rights. Because the stop was supported by reasonable suspicion, the police officers were properly entitled to qualified immunity as to that claim.

B. <u>Qualified Immunity on the Excessive Force Claims</u>

By contrast, the Appellees' entitlement to qualified immunity as to the Appellants' excessive force claims was incorrectly granted by the district court at the summary judgment stage. Indeed, in light of the genuine disputes of material fact concerning the actual conduct of the police officers in executing the seizure and search, we reverse the district court's grant of summary judgment on this issue, and remand the case for trial on the § 1983 excessive force claims.

The Supreme Court, in <u>Graham v. Connor</u>, 490 U.S. 386 (1989), fully addressed the constitutional standard which governs § 1983 claims arising from a police officer's alleged use of excessive force in making an arrest, investigatory stop, or other seizure of an individual's person. In <u>Graham</u>, the petitioner sought to recover damages for injuries allegedly sustained when the officers used physical force against him during the course of an investigatory stop. 490 U.S. at 388. The Supreme Court, reversing a decision of the Fourth Circuit, articulated an "objective reasonableness standard" for addressing such cases. <u>Id.</u> at 392. In particular, the Court held that in addressing a § 1983 excessive force claim, proper analysis begins by identifying

15

the specific constitutional right allegedly infringed by the challenged application of force; in the context of an arrest or investigatory stop, the Court found that an excessive force claim is most properly characterized as invoking the Fourth Amendment. Id. at 394. The Court held that in judging the reasonableness of a stop or seizure under the Fourth Amendment, three factors should be considered: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest by flight. Id. at 396. Additionally, the Court held:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Id. at 396-97. Therefore, the Court explicitly rejected an approach in which the police officer's "good faith" would be relevant. Id. at 397.

The Fourth Circuit, in Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994), recently applied that test in a § 1983 excessive force case in which the district court had denied an officer's claim of entitlement to qualified immunity on a motion for summary judgment. 41 F.3d at 171. In that case, the actual amount of force used by the police was in dispute. Id. at 172. In affirming the denial of qualified immunity by the district court, we outlined the proper inquiry that should be undertaken in addressing claims of qualified immunity in excessive force cases:

> The reasonableness inquiry is an objective one. To gauge objective reasonableness, a court examines only the actions

16

at issue and measures them against what a reasonable officer would do under the circumstances. Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case.

Though it focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question. Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived. In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are.

Id. at 172-73. Under that standard, it was found that, in evaluating a police officer's entitlement to qualified immunity against excessive force claims, the proper inquiry is "whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances. The test is not rigid or mechanical but depends on the `facts and circumstances of each particular case.'" Id. at 173, quoting Graham, 490 U.S. at 396. As part of the reasonableness analysis, the Court urged that the three Graham factors be considered together: (1) the severity of the suspected crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively attempted to evade arrest by flight. Id. Under that rubric of analysis, the Court found that the police officer in the case was not entitled to qualified immunity because (1) the offense of stealing five dollars was minor, (2) the suspect posed no threat to the officer, and (3) the facts suggesting resistance by the suspect were disputed. Id. at 174. In so finding, the Court held that although disputed versions of the facts alone are not enough to warrant denial of summary judgment, such disputed

17

facts combined with unfavorable <u>Graham</u> factors, suggest that granting summary judgment to a police officer on the issue of qualified immunity is inappropriate. <u>Id. Cf. Slattery v. Rizzo</u>, 939 F.2d 213 (4th Cir. 1991) (finding that a narcotics officer participating in a sting operation could have believed that the arrestee posed a deadly threat, and was thus entitled to qualified immunity in an excessive force case, where past incidents involving weapons and violence had occurred at the location of the arrest and where the arrestee ignored the officer's order to raise his hands and instead turned toward the officer with an object in his hand).

In applying the case law of the Fourth Circuit and the Supreme Court to the instant case, it appears that the behavior of the police officers here was sufficiently in dispute that qualified immunity should <u>not</u> have been granted on the excessive force claims at the summary judgment stage. Indeed, in the instant case, the application of the third prong of the qualified immunity analysis -- whether a reasonable police officer in the same circumstances would have known he was violating a clearly established right-- suggests that qualified immunity was improperly granted. Several considerations, in particular, compel a reversal of the district court's decision as to the excessive force claims.

First, as expressly stated by the Supreme Court in <u>Graham v. Connor, supra</u>, and reaffirmed by the Fourth Circuit in <u>Rowland, supra</u>, it is well established that in judging the reasonableness of a stop or seizure, three factors must be considered: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest by flight. In the instant case, the application of these three factors suggest that the force used by Appellees was unreasonable, taking the facts in the light most favorable to the non-movants, the Appellants. First, it is undeniable that the crime at issue -- Wooten's murder of an individual -- was a severe and gruesome crime. Second, however, the Appellants, by their behavior, certainly did not pose an immediate threat to the safety of the officers or others; indeed, it is undisputed that they were extremely compliant throughout the stop. Third, the Appellants certainly did not actively resist arrest by attempting to flee the scene; indeed, even under the police officers' version of the facts, the Appellants in no way resisted the

18

police's efforts to get them out of the car, handcuff them, and search them, unlike in <u>Slattery v. Rizzo, supra</u>. Thus, the three-factor <u>Graham</u> test suggests that the facts in this case do not support the degree of force allegedly used by the Appellees.

Second, and related, <u>Graham</u> expressly held that the "reason-ableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions were "objectively reason-able" in light of the facts and circumstances confronting them, with-out regard to their underlying intent or motivation; indeed, the Court expressly held that an officer's good intentions do not make an objec-tively unreasonable use of force constitutional. <u>Graham</u>, 490 U.S. at 397. Accordingly, the Appellees cannot claim entitlement to qualified immunity here simply by arguing that the police in this case acted in good faith in order to protect the Appellants. Indeed, under the express standard put forth by the Supreme Court, it is clear that the officer's subjective good faith is irrelevant to the analysis; it is the <u>objective</u> reasonableness of the officers' actions under the three-factor <u>Graham</u> test that is dispositive here.

Third, the issue of qualified immunity on this claim was not appro-priate for disposition at the summary judgment stage. This Court in <u>Rowland v. Perry, supra</u>, recently held that although disputed ver-sions of the facts <u>alone</u> are not sufficient to warrant denial of sum-mary judgment, such disputed facts <u>combined with unfavorable Graham factors</u>, suggest that granting summary judgment to police officers on the basis of qualified immunity is inappropriate. 41 F.3d at 174. In the instant case, as discussed above, the application of the <u>Graham</u> factors was unfavorable to the police since the factors sug-gest that the degree of force used was unreasonable. Moreover, in the instant case, the facts concerning the amount of force used were expressly disputed; indeed, the two parties disagreed on almost every claim made, including (1) whether the police had their guns trained on the minor Appellants when they exited the car, (2) whether the police clicked and cocked their guns in an intimidating way, (3) whether the police sexually fondled the Appellants during the pat-down searches, and (4) whether guns were held against the minor Appellants' heads. Remembering that on summary judgment the non-movant's version of disputed facts is accepted, and applying the <u>Graham</u> factors, summary judgment on qualified immunity should

19

have been denied because there clearly existed genuine disputes of material fact. Indeed, taking the Appellants' allegations in the light most favorable to them, as a court should on a motion for summary judgment, the Appellees' actions clearly would have amounted to excessive force.**3** See Pritchett v. Alford, 973 F.2d at 313 ("[i]f there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issues must be reserved for trial.").

Fourth, even under the police officers' version of the facts, the amount of force used may have been unreasonable. First, the Appellees concede that they knew that Onte Taft, although of a heavy build, was not Wooten as soon as he stepped out of the car, see Appellees' Brief at 9; thus, it is unclear why they searched Onte, handcuffed him, and forced him to kneel on the road in front of a patrol car. Second, the Appellees clearly knew that Jeanette Taft was a female, and thus that she could not be the suspected murderer; again, therefore, it is unclear why they searched her, handcuffed her, and forced her into the back seat of a police car.**4** Third, and related, the Appellees concede that Jeanette Taft was placed in the backseat of the patrol car with the handcuffs in front of her, while Onte Taft was placed on his knees facing the headlights of a patrol car; they allege, however, that these "inconveniences" were undertaken to"protect" the Appellants. It is unclear, however, how handcuffing and restraining Onte and Jeanette in the fashion employed would in any way protect them. Finally, it is unclear why the minor Appellants were handcuffed in light of the fact that they clearly did not pose a threat to the police officers, and in light of the fact that they plainly did not match Wooten's description.

_____

**3** The Appellees argue in their Brief that because the Appellants do not allege that the pat-down ever extended underneath their clothing or undergarments, there is no genuine issue of material fact that the force used was excessive or sexually abusive. There is no support in the case law, however, that a pat-down search has to extend beneath the clothing in order for it to be sexually abusive.
**4** This case is distinguishable from United States v. Taylor, 857 F.2d 210 (4th Cir. 1988), because in Taylor, the actual suspect was known to be in the car when the police stopped the car. In the instant case, by contrast, the Appellants clearly could not have been Wooten.

20

For the foregoing reasons, we reverse the district court's finding of qualified immunity on the excessive force claims, and remand the case for trial only on those particular claims. Although the officers were entitled to qualified immunity as to their actual decision to stop the vehicle, they were not entitled to such a determination as to their alleged use of excessive force in carrying out the seizure and search. Of course, at a trial, the reasonableness of what the Appellees actually did may be established, in which case qualified immunity could then be deemed proper.

III. <u>Denial of Motion for Continuance</u>

The Appellants additionally assert on appeal that the district court erred in denying their motion for continuance of the summary judgment hearing in order to allow for time to conduct discovery on the issue of qualified immunity.[5] Because the case law suggests that discovery should have been afforded, we find that the district court erred in staying discovery into the Appellees' entitlement to qualified immunity or lack thereof.

The Supreme Court, in <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987), expressly addressed the standard under which discovery on the issue of qualified immunity should be afforded, when qualified immunity is claimed at the summary judgment stage of litigation. In that case, the district court had granted summary judgment to the police officers before any discovery occurred. In a footnote, the Court addressed the plaintiffs' claim that because no discovery had yet taken place, some discovery would be required before the defendants' summary judgment motion could be granted. 483 U.S. at 646 n. 6. In particular, the Court held:

_____

[5] The Appellants had filed, on May 18, 1994, a motion for continuance, asking for an order postponing the summary judgment hearing until such time as they had taken depositions, interrogatories, and requests for admissions from the six police officers involved in the stop. On May 23, 1994, the district court filed an order staying all discovery until the court ruled on the motion for summary judgment; the court noted that the order therefore rendered moot the Appellants' motion to continue.

21

One of the purposes of the <u>Harlow</u> qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government." For this reason, we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of litigation. <u>Thus, on remand, it should first be determined whether the actions the [plaintiffs] allege [the officer] to have taken are actions that a reasonable officer could have believed lawful. If they are, then [the officer] is entitled to dismissal prior to discovery. If they are not, and if the actions [the officer] claims he took are different from those the [plaintiffs] allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before [the officer's] motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of [the officer's] qualified immunity</u>.

<u>Id.</u> (citations omitted) (emphasis added).

Similarly, the Fourth Circuit, in <u>DiMeglio v. Haines</u>, 45 F.3d 790 (4th Cir. 1995), in reversing a district court's <u>denial</u> of qualified immunity on a motion for summary judgment, recently articulated the circumstances under which discovery should be afforded when one party in a § 1983 suit has moved for summary judgment on the issue of qualified immunity. In particular, we held that ordinarily, a question of qualified immunity involves an inquiry of a pure question of law, and hence is capable of decision at the summary judgment stage. 45 F.3d at 794. Indeed, the Court held that because the inquiry is purely legal, questions of qualified immunity should ordinarily be decided "long before trial," and that "even such pretrial matters as discovery are to be avoided if possible, as `[i]nquiries of this kind can be peculiarly disruptive of effective government.'" <u>Id.</u> at 795 (citations omitted). However, we also expressly held:

A district court may deny a motion for summary judgment based on qualified immunity and allow discovery to proceed only if it has addressed the threshold immunity question, and concluded (1) that the plaintiff alleged a violation of a

22

clearly established right, but (2) that there existed a material factual dispute over what actually occurred, and (3) under the defendant's version, a reasonable official could have believed that his conduct was lawful. In instances where there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved without discovery. In such circumstances, it simply may be impossible to protect the defendant from all of the burdens that attend the pretrial process. Of course, after discovery and upon a proper motion, the district court may reconsider the question of qualified immunity. "[I]f discovery fail[ed] to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts," the defendant will yet be entitled to summary judgment, even though the acts alleged by the plaintiff constitute a violation of clearly established rights.

Id. (citations omitted) (emphasis added). Under that standard, we found that the district court erred in denying a motion for summary judgment before discovery was complete, despite discrepancies between the parties' factual allegations. Id. at 803. In particular, this Court found that the district court erred in failing first to address whether, based on the plaintiff's allegations, the official's actions indeed violated clearly established law. Id. at 803.

Applying those principles to the instant case, it is clear that in this case, the district court should have afforded more time for discovery before the motion for summary judgment was determined by the court.**6** The cases above suggest that discovery should be afforded when (1) the actions that the plaintiffs allege the police to have taken are determined not to be actions that a reasonable officer could have believed lawful, and (2) the actions the officers claim they took differ

_____
**6** At the time of the motion, no discovery had been conducted by either party into the issue of qualified immunity. The only evidence before the district court were affidavits, submitted by both sides, which generally described the incident.

23

from those the plaintiffs allege (and are actions that reasonable officers could have believed lawful). <u>Anderson v. Creighton</u>, 483 U.S. at 646 n. 6. The instant case presents precisely that situation: (1) the actions that the <u>Appellants</u> allege the officers to have taken (including sexual abuse and cocking of guns against the minor Appellants' heads) are <u>not</u> actions that a reasonable officer could have believed to be lawful under the circumstances, and (2) the actions the <u>officers</u> claim they took (simply patting down and handcuffing the Appellants) are different from those the Appellants allege and are actions that a reasonable officer <u>could</u> have believed to be lawful. Thus, in this case, discovery on the issue of qualified immunity should have been afforded before summary judgment on the issue of qualified immunity was finally determined. Indeed, the instant case presents precisely the type of situation, envisioned by the Supreme Court in <u>Anderson</u> and by this Court in <u>DiMeglio</u>, in which there is a material dispute over what the defendants did, and under the plaintiffs' version of the events the defendants would have, but under the defendants' version they would not have, violated clearly established law. As stated in <u>DiMeglio</u>, in such cases, it may be that the qualified immunity question cannot be resolved without discovery, and in such circumstances, it simply may be impossible to protect the defendants from all of the burdens that attend the pretrial process. Such a result does not mean that unrestricted discovery will follow; indeed, discovery should be confined to the qualified immunity question only.

Therefore, in the case at bar, the district court should not have mooted the Appellant's motion for continuance by staying discovery prematurely. We find that the district court erred.

Accordingly, the judgment is

<u>AFFIRMED IN PART AND REVERSED IN PART</u>.

DIANA GRIBBON MOTZ, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court properly granted the officers summary judgment with regard to the claim that the stop was unlawful and so concur in that holding. However, because I believe that the district court was also correct in finding that the officers were

24

entitled to summary judgment on the excessive force claim, I respect-
fully dissent from that portion of the majority's opinion concluding
to the contrary.

In their second amended complaint, appellants alleged that the
police officers: (1) conducted illegal body searches of the "female
minor children" that involved "fondling and mishandling" their "but-
tocks, breasts and private body parts," (2) used excessive extreme
force on a minor male "by grabbing him in the groin and private body
areas, causing him great pain and physical harm coupled with extreme
mental distress," and (3) "violate[d] the rights" of the children "by
placing guns to their heads and cocking and clicking the weapons."
The complaint was verified by Ms. Jeanette Taft, individually and as
guardian <u>ad litem</u> for two of the minors, and by Harry Teel, Sr.,
guardian <u>ad litem</u> for the other two.

The officers, asserting qualified immunity, moved for summary
judgment on all claims; attached to that motion were numerous
detailed affidavits in which the officers categorically denied the above
allegations. The district court granted the officers summary judgment
on the claim that the stop of Ms. Taft's automobile was illegal but
denied it as to the excessive force claims asserted in the language
quoted above. The district court opined:

> plaintiffs' additional allegations that defendants "cocked and
> clicked" loaded firearms, pointed them at the minor plain-
> tiffs' heads, and sexually abused those children by fondling
> their private parts during a "frisk for weapons" are
> extremely serious. If true, they take defendants' actions well
> outside the realm of objective reasonableness under the cir-
> cumstances.

The district court noted, however, that these allegations of "cocking
and clicking" and "sexual abuse," which had been denied under oath
by defendants, had been verified only by Mr. Teel and Ms. Taft and
it was "not apparent" how either of them "came to acquire personal
knowledge of these allegations." This was so because Mr. Teel was
not present during the incident and because the record did not reflect
how Ms. Taft was able to hear or see the events that occurred during
the stop from her vantage point in the backseat of the patrol car. For

25

this reason, the district court directed the appellants to file "proper affidavits or other competent documentation" that"detailed" the basis of "personal knowledge" of "(i) their allegations of sexual abuse of the minor children and (ii) their charges that defendants cocked and clicked loaded weapons against the children's heads."

In response to this order, Ms. Taft, the minor appellants, and some third persons filed affidavits.[1] Although the minor appellants did not address the body searches or "sexual abuse" at all, Ms. Taft asserted that police officers searched her by "touch[ing]" her "breasts and buttocks" and "between [her] legs in [her] private parts." She also asserted that police similarly searched the minor female passengers by "patt[ing]" their "breast area[s]" and searching "inside and outside of [their] legs and private parts," and searched her son "between his legs in his groin area." These assertions appear totally consistent with a typical police pat-down search; no witness provided an affidavit indicating that the search was other than typical or that it actually involved, as had earlier been alleged, "fondling and mishandling." Furthermore, while all appellants averred in their respective affidavits that the officers drew their guns and pointed them at the children during the incident, and that the "cocking and clicking sounds of the guns scared" the children "very much," no affiant claimed that the guns were placed against the children's heads.

Upon receiving these submissions, the district court ultimately concluded that the appellants had not offered any evidentiary support for the allegations in their complaint that the officers had "sexually abused" the minors. The court noted that, #7F 79AD#f]risking' a person to determine if he or she is secreting a weapon necessarily involves patting down -- touching -- all parts of the body" but "[f]risking a carload of individuals whom law enforcement officers reasonably believe may be involved with a very recent homicide is a far cry from `sexual abuse.'" Further, the district court found that the appellants had not supplied a "factual basis for the contention" that the officers "pointed loaded and cocked weapons directly at the heads of the minor plaintiffs." The court explained that "[p]ointing a weapon in the

_____

[1] Ms. Taft explained that she had personal knowledge of these events because during the entire stop she had an unobstructed view of the children from her vantage point in the patrol car.

direction of a person and failing to lower it as he or she walks past simply is not comparable to placing that weapon against a child's head and cocking it." The court concluded that the appellants had failed to carry their burden in opposing the officers' motion for summary judgment based on qualified immunity, reasoning:

> Being the subject of an armed felony stop at night by numerous law enforcement officers most certainly would be a terrifying experience for guilty and innocent alike, regardless of their sex or age. However, in exigent circumstances, the law permits its enforcement officers to conduct such procedures in order to protect the community from a dangerous and violent offender. As frightening as these events must have been for the plaintiffs, these acts present a textbook case for the imposition of qualified immunity. Not every mistaken act by "state actors" is premised on unconstitutional motives.[2]

In my view, on this record, the district court correctly granted summary judgment on all claims. Indeed, the care and sensitivity with which the court below handled this case is to be commended. After painstakingly examining the complaint and finding it lacking in evidentiary support, the district court afforded appellants an additional opportunity to support their allegations. Only after taking this step, which benefited appellants and was certainly well within the district court's jurisdiction, see Marx v. Gumbinner, 855 F.2d 783, 792 (11th Cir. 1988) (when "plaintiff's complaint provides an inadequate factual basis" to determine a defendant's claim of qualified immunity, "the district court may exercise its inherent power to narrow the issues for trial and require the plaintiff to state with more specificity the factual allegations supporting the claim"), did the court conclude that the officers were entitled to qualified immunity on the excessive force claims. I believe the case law required this conclusion.

_____

[2] The appellants filed a "motion for new trial or to amend findings in judgment," which the court construed as a motion to reconsider. Appellants never suggested in that motion, or in this court, that, in fact, they do claim that the officers sexually abused the minor children or placed guns to their heads.

Government officials performing discretionary functions are gener-ally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Application of the qualified immunity defense to a claim of excessive force "requires careful attention to the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989). A court must employ a three-pronged analysis. First, the court must identify the specific constitutional right allegedly violated. Second, the court must deter-mine whether the right in question was established so clearly as to alert a reasonable officer to its constitutional significance. Third, the court must determine whether a reasonable officer could have believed that his conduct was lawful. Torcasio v. Murray, 57 F.3d 1340, 1343 (4th Cir. 1995) (citing Collinson v. Gott, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips, J., concurring)).

The sole excessive force claims for which Ms. Taft and the minor appellants have submitted evidentiary support in their affidavits are that, during the frisk search, the officers touched them in sensitive areas and trained weapons on them at close range. Thus, we are not called upon to determine if the officers enjoy qualified immunity for strip searches of unarmed minors. Compare Illinois v. LaFayette, 462 U.S. 640, 645 (1983) ("the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street") (dicta) and Logan v. Shealy, 660 F.2d 1007, (4th Cir. 1981) (no qualified immunity for policy of strip searching persons detained for minor offenses), cert. denied, 455 U.S. 942 (1982). See also Kraushaar v. Flanigan, 45 F.3d 1040, 1054 & n.7 (7th Cir. 1995) (collected cases). Nor are we confronted with the question of whether police officers are immune from liability when they hold guns to the heads of minors. Compare McDonald v. Haskins, 966 F.2d 292 (7th Cir. 1992) (no qualified immunity for holding gun to head of nine-year-old boy and threatening to pull trigger). Moreover, unlike the plaintiffs in Graham and Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994), appel-lants here did not suffer any injuries, let alone grievous ones. Compare Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir. 1991) (while pat-down frisk search was reasonable, it was not reasonable to hit a suspect "in the stomach with a flashlight, or choke and beat him, solely on the basis of . . . suspicion" that he was armed).

28

It is well established that "[i]nvestigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop." United States v. Taylor, 857 F.2d 210, 213 (4th Cir. 1988) (citing United States v. Hensley, 469 U.S. 221, 235 (1985)). Accordingly, police officers may conduct "pat-down" searches for weapons, Terry v. Ohio, 392 U.S. 1, 23-27 (1968); see also Taylor, 857 F.2d at 214. Furthermore, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or a threat thereof to effect it." Graham, 490 U.S. at 396. Thus, although "approaching a suspect with drawn weapons [is an] extraordinary measure[ ], such [a] police procedure[ ] [has] been justified in this circuit as a reasonable means of neutralizing potential danger to police and innocent bystanders." Taylor, 857 F.2d at 214.

The officers had reason to believe that an armed and dangerous suspect was in Ms. Taft's vehicle; thus, the officers were entitled to take precautions to ensure their safety and the safety of the passengers. For the purpose of summary judgment, it must be accepted as true that, as the passengers exited the vehicle, the officers kept their weapons trained on each of them, including the minor children. However, these minors could well have secreted weapons-- either willingly or unwillingly -- for the murderer. Moreover, one of the minors, at least superficially, resembled the suspect; although only fifteen years old, Onte Taft was 5'10" and weighed 180 pounds. In these circumstances, a reasonable police officer "could have believed" that continuing to point his weapon at the passengers as they left the car was lawful. See Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991).

The officers were also justified in frisking Ms. Taft and the minors for weapons. In her affidavit, Ms. Taft does not allege that the officers did anything other than "touch" or "pat" her and the other passengers, on top of their clothing, in certain sensitive areas. The Supreme Court, in approving of "pat-down" frisks in Terry , recognized that such searches may be humiliating and embarrassing: "Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience."

29

Terry, 392 U.S. at 24-25. Like the officers in Terry, however, the officers here had "reasonable grounds to believe that[one of the vehicle's passengers] was armed and dangerous, and it was necessary for the protection of [the officers] and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized." Id. at 30; see also United States v. Moore, 817 F.2d 1105, 1107-08 (4th Cir.), cert. denied, 484 U.S. 965 (1987).

As the district court recognized, "[b]eing the subject of an armed felony stop at night by numerous law enforcement officers most certainly" is "terrifying." The appellants are entitled to our empathy -- and our sympathy. This is not an experience to be wished on anyone. However, in other circumstances, for example if the murderer had commandeered their car, they might well have been grateful for the safeguards taken by the police. In any event, there is no evidence that the officers violated any clearly established rights in searching and restraining Ms. Taft and the children. A reasonable officer under these circumstances certainly could have believed that his conduct was lawful. Accordingly, I would affirm the district court's grant of summary judgment on the excessive force claims.